**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| PROJECT FOR PRIVACY AND | : | | |
| SURVEILLANCE ACCOUNTABILITY, | : | | |
| INC., | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 21-2362 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 9, 13 |
| | : | | |
| UNITED STATES DEPARTMENT OF | : | | |
| JUSTICE, | : | | |
| | : | | |
| Defendant. | : | | |

**MEMORANDUM OPINION**

GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT; DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This case arises out of a Freedom of Information Act ("FOIA") dispute between Plaintiff

Project for Privacy and Surveillance Accountability, Inc. ("the Project") and Defendant United

States Department of Justice ("DOJ"). The Federal Bureau of Investigation ("FBI") is a

component of DOJ and a member of the Intelligence Community. The FBI engages in foreign

intelligence surveillance, which may incidentally capture information about U.S. persons in the

process. Generally, an intelligence agency must "mask" the names of U.S. persons with a

generic term to protect their identity. Under certain circumstances, however, these names may

be "unmasked." In this case, the Project wants access to communications between the FBI and

Congress concerning the unmasking of members of Congress. The FBI refused to confirm or

deny the existence of this information. It claimed FOIA Exemptions 1, 3, 6, 7(C), and 7(E). The

FBI is partially right. For the reasons described below, the Court finds that the FBI properly

issued a *Glomar* response for one category of documents but must go back and conduct a search for the other category.  Therefore, it grants in part and denies in part the DOJ's motion for summary judgment and denies the Project's cross-motion for summary judgment.

## II.  BACKGROUND

### A.  Statutory Background and the Gates Procedures

Understanding the FOIA request at issue requires a brief overview of the procedures that govern unmasking.  The Foreign Intelligence Surveillance Act ("FISA") permits the federal government to conduct surveillance on foreign persons, but intelligence agencies cannot intentionally target U.S. persons absent their consent or a court order.  *See* 50 U.S.C. §§ 1881a, 1881b, 1881c.  Still, foreign intelligence collection might incidentally capture information about U.S. persons.  When that happens, the agency must follow so-called "minimization procedures" to protect the identity of U.S. persons, including masking their identity by substituting their name with a generic phrase such as "U.S. person 1."  Seidel Decl. ¶¶ 16–17, ECF No. 9-2.  An agency can only disclose the name of a U.S. person "if it itself constitutes foreign intelligence, is necessary for the recipient to understand the foreign intelligence being transmitted, or is evidence of a crime."  *Id.* ¶ 17.  In those instances, the agency may unmask the identity of a U.S. person. *Id.*  Only authorized, high-ranking officials can submit an unmasking request "when revealing [a U.S. person's] identity is necessary to the dissemination of needed intelligence to protect national security."  *Id.*  Unmasking is subject to "strict limitations."  *Am. Ctr. for L. & Just. v. NSA*, 474 F. Supp. 3d 109, 117 (D.D.C. 2020) (explaining unmasking); *Schaerr v. United States Dep't of Just.*, 435 F. Supp. 3d 99, 105 (D.D.C. 2020) (same).

This case concerns congressional unmasking—that is, the unmasking of the identities of members of Congress.  In 1992, then-CIA Director Robert M. Gates notified Congress that he

had developed procedures governing "the dissemination of intelligence information referring to Members of Congress or their staff."  Pl.'s Response to Def.'s Statement of Material Facts & Pl.'s Counter-Statement of Material Facts ("Pl.'s Statement of Facts") ¶ 1, ECF No. 12; Ex. 1 to Pl.'s Cross-Mot. Summ. J. and Opp'n to Def.'s Mot. Summ. J. ("Pl.'s Cross-Mot."), ECF No. 12-1.  These so-called "Gates Procedures" were "re-confirm[ed]" in a 2013 memo by Director of National Intelligence ("DNI") James R. Clapper.  Pl.'s Statement of Facts ¶ 6; Ex. 2 to Pl.'s Cross-Mot. at 1, ECF No. 12-2.  In 2017, the DNI publicly released the latest version of the Gates Procedures on its social media webpage "in the interest of transparency."  Pl.'s Statement of Facts ¶ 13; Ex. 3 to Pl.'s Cross-Mot. ("DNI Release") at 1, ECF No. 12-3; Ex. 4 to Pl.'s Cross-Mot. ("Gates Procedures"), ECF No. 12-4.  The Gates Procedures are enshrined in Annex A of Intelligence Community Directive 112.  *See* Gates Procedures at 2; Ex. 5 to Pl.'s Cross-Mot., ECF No. 12-5.

The Gates Procedures "establish[] I[ntelligence] C[ommunity] policy for when an IC element seeks to disseminate unmasked or masked congressional identity information within the Executive Branch."  Gates Procedures § (B)(2).[1]  They explain that when congressional identity is masked, it is replaced with a generic term such as "Member of U.S. Congress."  *Id.* § (B)(4).  Generally, an agency must mask congressional identity prior to disseminating foreign intelligence; exceptions include congressional identity that is overtly collected, related to public statements by the member of Congress, involves consent, or is necessary to report violations of

---

[1] The Gates Procedures define "congressional identity" to include "current" members of Congress *or* current "staff officer[s]" of these members or of any congressional committee. Gates Procedures at 1 n.1.  Item 35 only seeks communications concerning the unmasking of members of Congress, so the Court's analysis will not discuss congressional staff.  *See* Ex. A to Compl. ("Request Letter") ¶ 35, ECF No. 1-1 (seeking communications "concerning the unmasking of Congressmen or Senators").

federal criminal law. *Id.* §§ (C)(1), (2). In addition, authorized officials can request congressional unmasking when "necessary to understand and assess the associated intelligence and further a lawful activity of the recipient's agency." *Id.* § (C)(3)(a)(i). Unmasking requests involving "sensitive matters" must be approved by the DNI, whereas all other requests may be approved by the DNI's Office of General Counsel. *Id.* § (C)(3)(c). When a dissemination of unmasked congressional identity occurs, the DNI's Office of Legislative Affairs must notify "in writing" the "congressional leadership staff and [ ] the intelligence committee's staff directors," or, in the case of possible violations of the law, "the congressional leadership staff." *Id.* §§ (D)(1)(a)–(c).

## B. Procedural History

The Project is a non-profit that "advocates for greater privacy and civil liberty protections from government surveillance." Compl. ¶ 5, ECF No. 1. On December 13, 2019, the Project submitted a FOIA letter to the FBI with a list of forty-four requests for categories of records. *See generally* Ex. A to Compl. ("Request Letter") ¶ 35, ECF No. 1-1. Only one request—what the parties call "Item 35"—is at issue in this case. Item 35 sought:

> All correspondence between individual Senators or Congressman and any agency, or between an agency and Congressional Leadership and/or either or both Congressional intelligence committees, concerning the unmasking of Congressmen or Senators, including but not limited to correspondence from or to Senator Rand Paul (R-KY), Senator Lindsey Graham (R-SC), Congresswoman Jane Harmon (D-CA), Congressman Dennis Kucinich (D-OH), Congressman Lou Barletta (R-PA), Congresswoman/ Senator-elect Marsha Blackburn (R-TN), Congressman Chris Collins (R-NY), Congressman Tom Marino (R-PA), Congressman Devin Nunes (R-CA), Congressman Sean Duffy (R-WI), Congressman Trey Gowdy (R-SC), and Congressman Dennis Ross (R-FL).

*Id.* ¶ 35. The FBI acknowledged receipt of the Request Letter on February 4, 2020. Ex. B to Seidel Decl., ECF No. 9-2. On July 7, 2020, the FBI notified the Project that it assigned a specific tracking number to Item 35. Ex. B to Compl., ECF No. 1-2. The FBI subsequently

issued a blanket *Glomar* response to Item 35 on October 13, 2020.  Ex. C to Compl., ECF No. 1-3.  It explained that "FBI can neither confirm nor deny the existence of records responsive to [the] request," and claimed FOIA Exemptions 1, 3, 6, 7(C), and 7(E).  *Id.* at 1.  The Project appealed this decision to DOJ's Office of Information Policy ("OIP"), Ex. E to Seidel Decl., ECF No. 9-2, which subsequently affirmed the FBI's decision, Ex. F to Compl., ECF No. 1-6.  The Project then brought suit in this Court.  DOJ now moves for summary judgment on the FBI's *Glomar* response.  ECF No. 9.  In support of its motion, it relies on two declarations from Michael G. Seidel, FBI's Section Chief of the Record/Information Dissemination Section of the Information Management Division.  Seidel Decl. ¶ 1; 2d Seidel Decl. ¶ 1, ECF No. 14-2.  The Project cross-moves for summary judgment.  ECF No. 13.  The Court held argument on the parties' cross-motions.  *See* Min. Entry (Sept. 21, 2022).  The cross-motions are now ripe for decision.

## III.  LEGAL STANDARD

The Freedom of Information Act is meant "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."  *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)).  It "directs that 'each agency, upon any request for records . . . shall make the records promptly available to any person' unless the requested records fall within one of the statute's nine exemptions."  *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (quoting 5 U.S.C. § 552(a)(3)(a)).  "Consistent with the Act's goal of broad disclosure," those exemptions should be "given a narrow compass."  *U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 151 (1989).  "The agency bears the burden of establishing that a claimed exemption applies."  *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just. (*"CREW"*)*, 746 F.3d 1082, 1088 (D.C. Cir. 2014).

Because FOIA cases do not ordinarily involve disputed facts, they "are typically and appropriately decided on motions for summary judgment." *Moore v. Bush*, 601 F. Supp. 2d 6, 12 (D.D.C. 2009) (citations omitted).  Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In assessing whether the movant has met that burden, a court "must view the evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in his favor, and eschew making credibility determinations or weighing the evidence." *Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir. 2008) (citations omitted).  "This burden does not shift even when the requester files a cross-motion for summary judgment because 'the Government ultimately has the onus of proving that the documents are exempt from disclosure . . . .'" *Hardy v. ATF*, 243 F. Supp. 3d 155, 162 (D.D.C. 2017) (cleaned up) (quoting *Pub. Citizen Health Research Grp. v. FDA*, 185 F.3d 898, 904–05 (D.C. Cir. 1999)).  Even if a FOIA exemption applies, an agency cannot withhold information unless it also "reasonably foresees that disclosure would harm an interest protected by" the exemption.  5 U.S.C. § 552(a)(8)(A)(i)(I); *see Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) (explaining the FOIA Improvement Act of 2016's "foreseeable harm" requirement).

Instead of searching for and withholding exempt records, "an agency may issue a *Glomar* response, *i.e.,* refuse to confirm or deny the existence or nonexistence of responsive records if the particular FOIA exemption at issue would itself preclude the acknowledgement of such documents." *Elec. Priv. Info. Ctr. v. NSA ("EPIC")*, 678 F.3d 926, 931 (D.C. Cir. 2012) (citing *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007)).[2]  In considering a *Glomar* response, courts

---

[2] The term "*Glomar* response" is derived from a ship, the *Glomar Explorer*, at issue in a FOIA case, *Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976).  *See Knight First Amend. Inst. at Columbia Univ. v. CIA*, 11 F.4th 810, 813 (D.C. Cir. 2021).

apply the "general exemption review standards established in non-*Glomar* cases." *Knight First Amend. Inst. at Columbia Univ. v. CIA*, 11 F.4th 810, 813 (D.C. Cir. 2021) (quoting *Wolf*, 473 F.3d at 374). "An agency thus bears the burden to sustain a *Glomar* response." *Id.* (citing 5 U.S.C. § 552(a)(4)(B)).

"[W]hen a *Glomar* response touches upon issues of national security—'a uniquely executive purview'—courts must give agency decisions substantial deference." *Competitive Enter. Inst. v. NSA*, 78 F. Supp. 3d 45, 53 (D.D.C. 2015) (quoting *EPIC*, 678 F.3d at 931). Thus, courts "consistently defer[] to executive affidavits predicting harm to national security, and have found it unwise to undertake searching judicial review." *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice,* 331 F.3d 918, 927 (D.C. Cir. 2003). Courts must sustain an agency's *Glomar* response in the national security context so long as the agency's explanation appears "logical" and "plausible." *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 624 (D.C. Cir. 2011) (in the national security context, "the government's burden is a light one").

## IV.  ANALYSIS

The Court's analysis proceeds in two steps. First, the parties dispute whether the FBI has waived its *Glomar* response. The Project argues that the FBI cannot issue a *Glomar* response due to the existence of several documents in the public record, including the Gates Procedures. But none of these documents reveals that the FBI has acknowledged the existence of responsive information to Item 35. Therefore, the FBI has not waived its *Glomar* response. Second, on the merits, the Court finds that the FBI's *Glomar* response is justified with respect to the agency's FISA-obtained or -derived documents that reveal the operation and fruits of congressional unmasking (the "operational documents"). But there exists a separate category of documents: communications between the FBI and Congress that are a degree removed from the FISA-

derived documents and which discuss congressional unmasking as a matter of legislative interest, policy, or oversight (the "policy documents").  The FBI must conduct a search for any "policy documents" in its possession.  The FBI will then have an opportunity to withhold information from the search on the basis of any relevant FOIA exemptions.

### A.  Whether the FBI has Waived *Glomar*

The Court will first consider whether the FBI has waived its *Glomar* response.  The Project claims that the FBI's *Glomar* response is unjustified because "the I[ntelligence] C[ommunity] has already publicized the fact that it advises Congress about Congressional unmaskings through written notifications."  Pl.'s Cross-Mot. at 10.  It cites the Gates Procedures, which the Project claims reveals that "[f]or at least thirty years, the IC has frankly admitted . . . that it routinely 'advise[s] Congress' about those practices."  *Id.*  The Project also relies on another disclosure, a 2020 memo from then-Acting DNI Richard Grenell that contains "the names of federal officials who submitted requests to unmask the identity of former National Security Advisor Michael Flynn between 2016 and 2017."  *Id.* at 13; *see* Ex. 6 to Pl.'s Cross-Mot. ("Grenell Memo"), ECF No. 12-6.

"An agency waives any right to make a *Glomar* response by disclosing whether responsive records exist."  *Knight*, 11 F.4th at 815 (citation omitted).  "Once an agency makes such an acknowledgment, 'there is no value in a *Glomar* response.  The secret is out.'"  *Id.* (quoting *Leopold v. CIA*, 987 F.3d 163, 167 n.5 (D.C. Cir. 2021)).  "To establish official acknowledgment, a plaintiff must identify information in the public domain that (1) matches the information requested, (2) is as specific, and (3) has 'been made public through an official and documented disclosure.'"  *Id.* (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990)).  The D.C. Circuit has noted that this test is "strict."  *Leopold*, 987 F.3d at 170 (citation omitted).

"The insistence on exactitude recognizes 'the Government's vital interest in information relating to national security and foreign affairs.'"  *Wolf*, 473 F.3d at 378.  "The plaintiff bears the burden of identifying specific information that is already in the public domain due to official disclosure." *Mobley v. CIA*, 806 F.3d 568, 583 (D.C. Cir. 2015) (citations omitted); *EPIC*, 678 F.3d at 933 (same).

The Court considers the Grenell Memo first.  The Grenell Memo is a declassified document that provides "a list of identities of any officials who submitted requests to the National Security Agency at any point between 8 November 2016 and 31 January 2017, to unmask the identity of former National Security Advisor, Lieutenant General Michael T. Flynn (USA-Ret)."  Grenell Memo at 3; Pl.'s Statement of Facts ¶ 23.[3]  The memo states that "16 authorized individuals requesting unmaskings" for "Lt. Gen Flynn's identity" within the date range, and includes a chart documenting these requests.  Grenell Memo at 4.

The Grenell Memo cannot constitute public acknowledgement for the simple reason that disclosures about General Flynn say nothing about the unmasking of *members of Congress*.  Item 35 concerns the unmasking of members of Congress, not just any public official.  Thus, information about the unmasking of General Flynn, who has never served as a member of Congress, does not undermine the FBI's *Glomar* response here.  This conclusion is well supported by *American Center*.  474 F. Supp. 3d 109 (D.D.C. 2020).  That case also considered the effect of the Grenell Memo on the issue of public acknowledgment.  There, the NSA issued a *Glomar* response to plaintiff's request for "unmasking requests from Susan Rice, Cheryl Mills, Valerie Jarrett, Loretta Lynch, and Ben Rhodes" concerning Donald Trump and forty-six other

---

[3] Because the Grenell Memo lacks page numbers, the Court cites to the ECF page number.

specified individuals.  *Id.* at 124.  The Court upheld the NSA's *Glomar* response.  *Id.*  It reasoned that because the Grenell Memo did not "establish the existence of any records of unmasking requests from" these five senior Obama Administration officials, "it fails to overcome the [agency's] *Glomar* response."  *Id.* at 124.  So too, here.  The Grenell Memo does not undermine the FBI's *Glomar* response because the memo only reveals unmasking information concerning General Flynn and "does not establish the existence of any records" concerning the unmasking of members of Congress.  *Id.*

The Gates Procedures are closer to the mark, but they do not waive the FBI's *Glomar* response, either.  The Project contends that these "publicly available" congressional unmasking procedures "readily admit" that "records about Congressional identity information are being generated and retained" and "written notifications concerning those practices are being sent to Congress."  Pl.'s Cross-Mot. at 12.  To be sure, the Gates Procedures require Congress to be notified "in writing" in the event of congressional unmasking.  Gates Procedures § (D).  And the DNI has also publicly acknowledged that congressional unmasking occurs "on occasion."  *See* DNI Release.  Furthermore, the DNI is the head of the Intelligence Community, so it could speak on the FBI's behalf for *Glomar* purposes.  *See American Center* at 123 n.10 (DNI's statements can waive State Department's *Glomar* response) (quoting *ACLU*, 710 F.3d at 429 n.7)).  At first glance, one might think that the Gates Procedures have effectively acknowledged the FBI's unmasking activities.

But upon closer inspection, none of the Project's evidence shows that *the FBI* has acknowledged possessing such information.  The Project, which "bears the burden" to show public acknowledgment, cannot make this showing for two reasons.  *Mobley*, 806 F.3d at 583.  First, the Gates Procedures do not say that *the FBI* possesses communications with Congress

about its unmasking activities.  The Gates Procedures apply to the Intelligence Community, which consists of over a dozen agencies besides the FBI.  *See* 50 U.S.C. § 3003(4)(H).  At best, the existence of the procedures, coupled with the DNI's statement that congressional unmasking occurs "on occasion," reveal that *members* of the Intelligence Community engage in congressional unmasking—but not necessarily the FBI in particular.  The public acknowledgment doctrine demands "specific information that matches the information sought," but the Gates Procedures do not match what Item 35 seeks.  *Leopold*, 987 F.3d at 171; *see Wolf*, 473 F.3d at 378 ("[T]he information requested must be as specific as the information previously released." (citation omitted)).

Second, assuming (without granting) that the Gates Procedures reveal that the FBI engages in congressional unmasking, they do not confirm that the FBI possesses *communications* with Congress about this activity.  To the contrary, the Gates Procedures specify that *the DNI's Office of Legislative Affairs*—not the originating agency—"will notify appropriate congressional staff that a dissemination of unmasked congressional identity information has taken place." Gates Procedures § (D)(1); *see also id.* § (E)(3) (assigning "ODNI/OLA" this task under "ROLES AND RESPONSIBILITIES").  Under the Gates Procedures, the buck stops at the DNI for unmasking decisions, *see id.* § (C)(3)(c), so it is perhaps unsurprising that the DNI's office is also tasked with notifying Congress.  Of course, the Gates Procedures do not rule out the possibility that the FBI possesses communications with Congress concerning congressional unmasking—but that is beside the point.  The Project's burden is to show that these procedures *confirm* that the FBI possesses such information, and it has not met it.  *See Leopold*, 987 F.3d at 171 ("To establish official acknowledgment our precedents require certainty, not

assumptions . . . .").  Therefore, neither the Grenell Memo nor the Gates Procedures waives the FBI's *Glomar* response.

### B.  Whether the FBI May Assert *Glomar* on the Merits

Having established that the FBI has not waived its *Glomar* response, the Court will consider whether the FBI is entitled to assert its *Glomar* response on the merits.  As mentioned above, the FBI's *Glomar* response can be organized into two categories of documents: (1) FISA-obtained or -derived "operational documents" which reveal the FBI's operations, any fruits of such operations, and/or any resulting congressional unmasking; and (2) "policy documents" which discuss congressional unmasking as a matter of legislative interest, policy, or oversight. The Court will consider each in turn.

#### 1.  "Operational Documents"

The FBI's *Glomar* response as to "operational documents" is justified by FOIA Exemptions 1 and 3.  Exemption 1 exempts records "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and [which] are in fact properly classified pursuant to such Executive order."  5 U.S.C. § 552(b)(1)(A); *see also Larson v. Dep't of State*, 565 F.3d 857, 861 (D.C. Cir. 2009).  The applicable classification order, Exec. Order ("E.O.") No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009), sets forth "both substantive and procedural criteria for classification."  *Jud. Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013).  It sets forth, in relevant part, the following conditions: (1) an original classification authority classifies the information; (2) the information is under the control of the United States Government; (3) the information falls under one or more of the categories of information listed in § 1.4 of the order; and (4) the classification authority determines that the unauthorized disclosure of the information reasonably could be

expected to result in damage to the national security . . . and the authority is able to identify or describe the damage.  E.O. 13,526 § 1.1; *see Competitive Enter. Inst. v. Dep't of Treasury*, 319 F. Supp. 3d 410, 417 (D.D.C. 2018).

The FBI claims that it has satisfied all four requirements.  Its declarant, Mr. Seidel, has original classification authority and determined that disclosing whether this information exists would reveal classified information.  *See* Def.'s Mot. Summ. J. ("Def.'s Mot.") at 11, ECF No. 9-1 (citing Seidel Decl. ¶¶ 2, 25, 29).  Mr. Seidel represents that this information is under the control of the United States, a point the Project does not dispute.  *Id.* ¶ 30.  He claims that this information is protected by E.O. 13,526 § 1.4(c), which covers "intelligence activities" and "intelligence sources or methods."  *Id.* According to Mr. Seidel, disclosing the existence of this information jeopardizes national security because it would "reveal the intelligence community's interest, or lack of interest, in the implicated individuals" and also "reveal[] strengths, weaknesses, and gaps in intelligence coverage."  Def.'s Mot. at 13; Seidel Decl. ¶¶ 25, 29, 31. Indeed, by acknowledging that it possesses or does not possess these "operational documents," the FBI would "confirm or refute the FBI's reliance" on this "particular intelligence activity or method."  *Id.* ¶ 34.  Finally, Mr. Seidel assures the Court that the withholding of this information is not for unlawful purposes but rather to protect national security.  *Id.* ¶ 35.  The Court finds the FBI's explanation logical and plausible.

The Project's counterarguments are unpersuasive.  First, it argues that the FBI's *Glomar* response fails certain procedural requirements of E.O. 13,526.  Pl.'s Cross-Mot. at 6–9; Pl.'s Reply in Support Cross-Mot. Summ. J. ("Pl.'s Reply") at 8–15, ECF No. 16 (citing E.O. 13,526 §§ 1.5-1.7).  For example, it claims that the FBI failed to certify that the *Glomar* fact itself is marked with declassification instructions or complied with the E.O.'s other transparency

procedures.  Pl.'s Cross-Mot. at 9.  But this argument "fundamentally misunderstands the general concept underpinning a Glomar determination," Def.'s Combined Opp'n to Pl.'s Cross-Mot. and Reply in Support of Def.'s Mot. Summ. J. ("Def.'s Reply") at 5, ECF No. 14, and was squarely rejected in *Mobley v. CIA*, 924 F. Supp. 2d 24 (D.D.C. 2013), *aff'd*, 806 F.3d 568 (D.C. Cir. 2015).  *Mobley* began with the well-established rule that E.O. 13,526 § 1.1 provides four threshold requirements for proper classification.  *Id.* at 47–48.  But it found that an agency need not establish that a *Glomar* fact meets E.O. 13,526's *other* procedures such as those found in §§ 1.5-1.6, which require, *inter alia*, establishing a timeline for declassification.  *Id.* at 49. Forcing an agency to comply with these other procedures, it reasoned, "would appear to require agencies to create a record in response to a FOIA request"—"which would be contrary to longstanding FOIA law."  *Id.* at 48–49; *see Kissinger v. Reps. Comm. for Freedom of the Press*, 445 U.S. 136, 152 (1980) ("The [FOIA] does not obligate agencies to create or retain documents; it only obligates them to provide access to those which it in fact has created and retained.").
*Mobley* recognized the "uniqueness of *Glomar* responses" as "intangible forms of classified information [that] . . . arise[] solely in the context of a response to a request for records." *Mobley*, 924 F. Supp. 2d at 49; *see Nat'l Sec. Couns. v. CIA*, No. 12-cv-284, 2016 WL 6684182, at *19 (D.D.C. Nov. 14, 2016) (following *Mobley*); *Gov't Accountability Project v. CIA*, 548 F. Supp. 3d 140, 154 n.7 (D.D.C. 2021) (citing *Mobley* favorably).  The Court agrees with *Mobley*'s reasoning and likewise holds that the FBI need not separately show that its *Glomar* fact complies with E.O. 13,526's other procedural requirements.  *See, e.g.*, E.O. 13,526 §§ 1.5-1.7.[4]

---

[4] The Project also argues that a *Glomar* response is inappropriate because it is "effectively a non-legislative amendment to the FOIA statute" that allows the FBI "to circumvent [its] statutory FOIA duties."  Pl.'s Cross-Mot. at 14.  But E.O. 13,526 itself permits a *Glomar* response, *see* E.O. 13,526 § 3.6, and courts routinely permit this practice, *see, e.g.*,

Second, the Project argues that a search is required because the FBI's *Glomar* response could rest in part on information that should be declassified and therefore ineligible for Exemption 1's protection. Pl.'s Cross-Mot. at 14–15. As support, the Project points out that E.O. 13,526 mandates automatic declassification for some documents over ten years old from the date of original classification. *Id.* (citing E.O. 13,526 § 1.5). The Project also notes that it did not specify a date range for Item 35. *Id.* According to the Project, the scope of the request must therefore include any declassified documents—which Exemption 1 does not protect. *Id.*; *cf. People for the Ethical Treatment of Animals v. Nat'l Institutes of Health, Dep't of Health & Hum. Servs. ("PETA")*, 745 F.3d 535, 540, 544–45 (D.C. Cir. 2014) (granting agency only partial *Glomar* response because "there exists a category of responsive documents for which a *Glomar* response would be unwarranted" and asking the agency to search for those documents).

The Project's argument is creative, but the Court need not reach it because Exemption 3 provides an independent basis to support the FBI's *Glomar* response as to any declassified documents. That is because information need not be classified to fall within Exemption 3's protection. *See Gardels v. CIA*, 689 F.2d 1100, 1106–07 (D.C. Cir. 1982) (Exemption 3 does not require "first determining that the withheld information was properly classified under Exemption 1" because "Exemption 3 is independent of Exemption 1 and may be invoked independently"); *Afshar v. Dep't of State*, 702 F.2d 1125, 1137 (D.C. Cir. 1983) (same). As explained below, the FBI is entitled to assert Exemption 3 over these "operational documents." Thus, regardless of whether the FBI possesses declassified "operational documents" that are responsive to Item 35, it

---

*Knight*, 11 F.4th at 821 ("The district court correctly concluded that the intelligence agencies' *Glomar* responses were valid under Exemption 1.").

is still entitled to assert a *Glomar* response over these documents.[5]  The FBI need not conduct a search for these documents.

The FBI's *Glomar* response is also justified under Exemption 3.  Exemption 3 permits the withholding of records that are "specifically exempted from disclosure by [a different] statute . . . if that statute . . . (i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3).  Under binding Circuit precedent, the agency must: "[1] show that the statute claimed is one of exemption as contemplated by Exemption 3 and [2] that the withheld material falls within the statute." *Larson*, 565 F.3d at 865 (citation omitted); *see DiBacco v. U.S. Army*, 795 F.3d 178, 197 (D.C. Cir. 2015) ("[T]he sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." (citation omitted)).

Here, the FBI's *Glomar* response with respect to the "operational documents" is permitted by section 102A(i)(1) of the National Security Act of 1947, 50 U.S.C. § 3024.  Seidel Decl. ¶ 36.  The D.C. Circuit has established that "Section 102A(i)(1) is an Exemption 3 withholding statute that mandates withholding of intelligence sources and methods."  *Willis v. NSA*, No. 17-cv-2038, 2019 WL 1924249, at *8 (D.D.C. Apr. 30, 2019) (quoting *DiBacco v. U.S. Army*, 795 F.3d 178, 199 (D.C. Cir. 2015)).  Section 102A(i)(1) provides that the DNI shall "protect intelligence sources and methods from unauthorized disclosure."  50 U.S.C.

---

[5] Furthermore, in the event declassified documents responsive to Item 35 exist, that fact would not waive the FBI's *Glomar* response, because the act of declassification does not automatically release the documents on the public record.  *See National Security Counselors*, 2016 WL 6684182, at *26 (rejecting plaintiff's argument that "because the documents they seek may no longer be properly classified, those documents are automatically subject to public disclosure" (emphasis omitted)).

§ 3024(i)(1).  The DNI has delegated enforcement of this statute to the heads of the agencies constituting the Intelligence Community, which includes the FBI.  Def.'s Mot. at 16–17 (citing 20 U.S.C. § 3003(4)(H)); *see Elec. Priv. Info. Ctr. v. Dep't of Just.*, 296 F. Supp. 3d 109, 121 (D.D.C. 2017) (explaining FBI's authority to invoke this statute); *McClanahan v. U.S. Dep't of Just.*, 204 F. Supp. 3d 30, 49 (D.D.C. 2016) (approving FBI's invocation of Section 102A(i)(1) under Exemption 3), *aff'd sub nom. McClanahan v. Dep't of Just.*, 712 F. App'x 6 (D.C. Cir. 2018).

In addition, the requested information plainly falls within the statute.  The Supreme Court has stated that section 102A gives the agency "wide-ranging authority" to protect intelligence sources and methods.  *CIA v. Sims*, 471 U.S. 159, 177 (1985); *see also Fitzgibbon*, 911 F.2d at 762 (noting that under section 102A, even "apparently innocuous information can be protected and withheld" so long as it "relates to intelligence sources and methods"); *Schaerr*, 435 F. Supp. 3d at 114 n.12 ("The protection[] provided by . . . § 3024 [is] absolute.").  Here, for the same reasons described in detail above, confirming or denying the existence of any "operational documents" would reveal the FBI's intelligence sources and methods concerning congressional unmasking.  *See* Seidel Decl. ¶¶ 31–34, 39–41 (describing how the requested information constitutes "intelligence sources and methods").  Revealing their existence or absence would allow a foreign adversary to draw inferences about the FBI's operations, any fruits of such operations, and/or any resulting congressional unmasking, and therefore endanger national security.  The Court once again finds the FBI's explanation logical and plausible.  Therefore, this information is independently entitled to a *Glomar* response under Exemption 3.[6]

---

[6] Because the FBI's "operational documents" are entitled to a *Glomar* response under Exemptions 1 and 3, the Court will not separately analyze whether the FBI is also entitled to invoke Exemptions 6, 7(C), and 7(E).  *See Schaerr*, 435 F. Supp. 3d at 110 n.6 ("Because the

2.  "Policy Documents"

The Court now turns to the other category of documents at issue: FBI's "policy documents."  Recall that the FBI's position is that disclosure of the existence of *any* congressional communications concerning congressional unmasking would "necessarily" reveal protected information.  Seidel Decl. ¶¶ 25, 29, 31.  The Project argues that the FBI's *Glomar* response sweeps too broadly because certain "extra-agency correspondence" between Congress and the FBI that is "one or more degrees removed from actual FISA activities" would not contain sensitive information protected by FOIA.  Pl.'s Reply at 6.  By way of example, the Project suggests that correspondence from a member of Congress to the FBI asking about congressional unmasking "would not necessarily disclose protected information any more than a FOIA request asking about congressional unmasking would necessarily do so."  *Id.* at 5.

At oral argument, the Court gave the FBI an opportunity to clarify its position with respect to this category of documents.  Government counsel stated that the FBI interpreted the core of the Project's request as seeking the FBI's "operational documents" concerning congressional unmasking.  *See* Def.'s Reply at 10 ("Information about FISA collections, thus implicating intelligence activities or intelligence sources or methods, is a fundamental element of the FOIA Request . . . .").  He reasoned that to the extent other categories of documents exist, they are hypothetical and not encompassed within the scope of the Project's FOIA request.  *See Knight*, 11 F.4th at 820 (observing that FOIA does not require agency to contemplate "hypothetical scenarios" of record categories that fall outside *Glomar*'s reach).

_____

Court finds that [the agency's] *Glomar* response was proper under FOIA Exemptions 1 and 3, it need not analyze whether it was also proper under Exemptions 6 or 7.").

The Court agrees with the FBI that an agency need not rule out every fringe category of documents potentially in existence before availing itself of *Glomar*'s protection.  But that principle does not decide the issue here, because the "policy documents" the Project seeks are well within the four corners of the FOIA request.  The FOIA request seeks "*[a]ll* correspondence . . . *concerning* the unmasking of Congressmen or Senators."  Item 35 (emphases added).  Item 35 plainly encompasses communications at the policy level, not just the operational level.  *See Corley v. Dep't of Just.*, 998 F.3d 981, 987 (D.C. Cir. 2021) ("The use of the word 'concerning' in relation to a document typically refers to the subject of the document; a document concerns a given subject if it is about that subject."); *see also Avila v. U.S. Dep't of State*, No. 17-cv-2685, 2022 WL 2104483, at *5 (D.D.C. June 10, 2022) ("The word[] 'concerning' . . . show[s] that Plaintiffs seek more than just records that have Agent Avila's name on them.").  "Policy documents" would include, for example, a letter from a member of Congress informing the FBI that she contemplated enshrining the Gates Procedures by statute, or an exchange between Congress and the FBI where Congress solicited the FBI's views on unmasking policies in light of media reports on the topic.  The FBI has an obligation to account for "policy documents" like these which are encompassed by the request.

The D.C. Circuit's decision in *PETA* provides ample support for the Project's position.  745 F.3d 535.  There, the agency issued a blanket *Glomar* response under Exemption 7(C) in response to a FOIA request concerning NIH investigations of animal abuse at a research lab.  *Id.* at 538.  The request sought "all National Institutes of Health (NIH) investigations into complaints filed 2005–present regarding [three specifically named NIH grant recipients]."  *Id.* at 539 (alterations in original).  Based on the named individuals' strong privacy interests, the D.C. Circuit approved the agency's *Glomar* response with respect to any information that would

associate the individuals with the investigation.  *Id.* at 544.  But that did not completely resolve

the case.  The Circuit liberally construed the FOIA request to "encompasses documents relating

to *any* ensuing investigation" arising from the complaints against the three individuals.  *Id.* at

544–45 (emphasis in original).   Accordingly, the Circuit ruled that the agency could not assert a

*Glomar* response over records of NIH investigations where the NIH "did not target the

researchers themselves."  *Id.* at 544.  Because this other category of records did not implicate

individual privacy interests under Exemption 7(C), the Circuit concluded that "NIH's assertion

of a blanket *Glomar* response . . . cannot be sustained" and ordered the agency to conduct a

search for that narrower category of records.  *Id.* at 545.  Thus, *PETA* instructs that an agency

may issue a blanket *Glomar* response—in other words, "not conduct any search for responsive

documents"—only when "the circumstances justify a *Glomar* response" for all categories of

responsive records.  *Id.* at 541.

　　　The circumstances here do not justify the FBI's *Glomar* response over the "policy

documents."  At oral argument, government counsel conceded that if the request specifically (or

only) sought "policy documents," the FBI's response would likely have been different.[7]  The

Court agrees.  It is difficult to see how the FBI's "policy documents" would be necessarily

protected under FOIA Exemptions 1, 3, 6, 7(C), and 7(E), which the FBI claims supports its

blanket *Glomar* response.  Unlike with "operational documents," acknowledging the mere

existence of "policy documents" would not necessarily reveal sensitive information about the

---

[7] The FBI's summary judgment filings in this case have focused on the argument that it
may protect sensitive FISA-obtained or -derived information—that is, "operational
documents"— under various FOIA exemptions.  *See, e.g.*, Seidel Decl. ¶¶ 20, 21, 23, 34.
Similarly, *Schaerr v. United States Dep't of Just.*, 435 F. Supp. 3d 99 (D.D.C. 2020), which the
FBI cites, also concerned a request for "operational documents"—namely, documents
concerning the unmasking of twenty-one specific individuals—so its holding is inapposite with
respect to the "policy documents" at issue here.

FBI's intelligence activities, sources, or methods under Exemptions 1 and 3.  At most, their existence would show Congress's interest in this field but not necessarily uncover anything about the FBI's activities or capabilities.  Nor would "policy documents" be necessarily protected under Exemptions 6 and 7(C) because policy-level discussions would not necessarily single out individuals and thereby implicate individual privacy rights.  Finally, the existence of "policy documents" would not necessarily disclose any law enforcement procedure, technique, or guideline that would risk circumvention of the law under Exemption 7(E), because acknowledging the existence of congressional inquiries would not necessarily reveal anything about the FBI's operations themselves, nor would it necessarily enable a wrongdoer to break the law or avoid detection.  "Because there exists a category of responsive documents for which a *Glomar* response would be unwarranted, [FBI's] assertion of a blanket *Glomar* response . . . cannot be sustained."  *PETA*, 745 F.3d at 545.  The FBI must conduct a search for "policy documents."[8]  Of course, it may be the case that some communications entail both policy and operational aspects, in which case the FBI must sort through what information it may protect on a document-by-document basis as is the norm under FOIA.  Only after conducting a search and assessing the fruits of such search may the FBI consider anew the propriety of *Glomar* and/or withholding documents under any relevant FOIA exemptions.

## V.  CONCLUSION

For the foregoing reasons, DOJ's motion for summary judgment (ECF No. 9) is **GRANTED IN PART AND DENIED IN PART**, and the Project's cross-motion for summary

---

[8] The Court envisions that such a search would, at a minimum, encompass searches by FBI personnel whose responsibilities include legislative affairs, congressional relations or other such congressional liaison duties.

judgment (ECF No. 13) is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  September 29, 2022                                        RUDOLPH CONTRERAS
                                                                          United States District Judge