**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| PROJECT FOR PRIVACY AND SURVEILLANCE ACCOUNTABILITY, INC., | : | | |
| | : | | |
| | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 21-2362 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 31, 34 |
| | : | | |
| UNITED STATES DEPARTMENT OF JUSTICE, | : | | |
| | : | | |
| | : | | |
| Defendant. | : | | |

## <u>MEMORANDUM OPINION</u>

GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S CROSS-
MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiff Project for Privacy and Surveillance Accountability, Inc. ("the Project") sued

Defendant United States Department of Justice ("DOJ") to compel the agency to disclose certain

records under the Freedom of Information Act ("FOIA").  The Federal Bureau of Investigation

("FBI"), a component of the DOJ, conducts foreign intelligence surveillance that may

incidentally collect information related to U.S. persons.  When incidental collection occurs,

intelligence agencies "mask" the names of U.S. persons to protect their identities.  Names may

be "unmasked," however, in certain circumstances.  The Project submitted a FOIA request to the

FBI seeking any correspondence between members of Congress and a federal agency concerning

the unmasking of Congressmen and Senators.  The FBI issued a *Glomar* response based on

various FOIA exemptions.  This Court partially denied the DOJ's motion for summary judgment,

concluding that documents discussing congressional unmasking as a matter of legislative

interest, policy, or oversight may not fall within FOIA's exemptions.  The FBI located 220

responsive pages, releasing 100 pages in whole or in part.  The Project now contests the FBI's

partial redactions of its Intelligence Program Policy Guide and an email summarizing

counterterrorism investigations under Exemptions 3, 7(D), and 7(E).  Because the FBI properly

applied the FOIA exemptions to the two records, the Court grants the DOJ's motion for summary

judgment and denies the Project's cross-motion for summary judgment.

## II.  BACKGROUND

The Court summarized the mechanics of the Foreign Intelligence Surveillance Act

("FISA"), as well as unmasking, in its previous memorandum opinion in this case.  *See* Mem.

Op., ECF No. 20; 633 F. Supp. 3d 108 (D.D.C. 2022).  The Project sent the FBI a FOIA request

on December 13, 2019, seeking documents responsive to 44 categories of information.  *See* Ex.

A to Compl., ECF No. 1-1.  Item 35 on that list requested the following records:

> All correspondence between individual Senators or Congressmen and any agency,
> or between an agency and Congressional leadership and/or either or both
> Congressional intelligence committees, concerning the unmasking of
> Congressmen or Senators, including but not limited to correspondence from or to
> Senator Rand Paul (R-KY), Senator Lindsey Graham (R-SC), Congresswoman
> Jane Harmon (D-CA), Congressman Dennis Kucinich (D-OH), Congressman Lou
> Barletta (R-PA), Congresswoman/Senator-elect Marsha Blackburn (R-TN),
> Congressman Chris Collins (R-NY), Congressman Tom Marino (R-PA),
> Congressman Devin Nunes (R- CA), Congressman Sean Duffy (R-WI),
> Congressman Trey Gowdy (R-SC), and Congressman Dennis Ross (R-FL).

*Id.* at 5–6.  On July 7, 2020, the FBI assigned a separate tracking number to Item 35.  Ex. B to

Compl., ECF No. 1-2.

On October 13, 2020, the FBI denied the Project's request for records related to Item 35,

stating that "the FBI cannot confirm or deny the existence of any records about your subject as

the mere acknowledgment of such records existence or nonexistence would in and of itself

trigger harm to national security interests."  Ex. C to Compl. at 1, ECF No. 1-3.  The Project

appealed this so-called "*Glomar* response" to the DOJ's Office of Information Policy, Ex. E to Seidel Decl., ECF No. 9-2, which affirmed the FBI's decision, Ex. F to Compl., ECF No. 1-6.

The Project filed this lawsuit, and the DOJ moved for summary judgment, contending that it properly issued a *Glomar* response under FOIA Exemptions 1, 3, 6, 7(C) and 7(E).  *See generally* Def.'s Mot. Summ. J., ECF No. 9-1.  The Project filed a cross motion for summary judgment.  *See generally* Pl.'s Cross-Mot. Summ. J., ECF No. 13-1.  This Court concluded that "[t]he FBI's Glomar response as to 'operational documents' is justified by FOIA Exemptions 1 and 3."  Mem. Op. at 12.  Declarations from Michael G. Seidel, FBI Section Chief of the Record/Information Dissemination Section of the Information Management Division, sufficiently demonstrated that any relevant information is properly classified and therefore subject to Exemption 1.  *Id.* at 12–13.  In addition, the FBI's *Glomar* response was justified under Exemption 3 because the materials fell within section 102A(i)(1) of the National Security Act of 1947, 50 U.S.C. § 3024, which mandates withholding of intelligence sources and methods.  *Id.* at 16–17.

The Court denied the DOJ summary judgment, however, regarding its reliance on exemptions to withhold "policy documents," which "discuss congressional unmasking as a matter of legislative interest, policy, or oversight."  *Id.* at 12.  These policy documents, the Court observed, would not necessarily be "protected under FOIA Exemptions 1, 3, 6, 7(C), and 7(E), which the FBI claims supports its blanket *Glomar* response."  *Id.*  Policy documents "would not necessarily reveal sensitive information about the FBI's intelligence activities, sources, or methods under Exemptions 1 and 3."  *Id.* at 20–21.  Nor would they "implicate individual privacy rights" under Exemptions 6 or 7(C) or "necessarily disclose any law enforcement procedure, technique, or guideline" under Exemption 7(E).  *Id.* at 21.  The Court ordered the FBI

to "(1) conduct a search for 'policy documents'; and (2) produce to the Project any non-exempt portions of such records."  Order, Mot. Summ. J., ECF No. 19.  The Court also instructed the FBI to renew its motion for summary judgment after conducting the search.  *Id.*

The FBI conducted its search, finding 220 pages of responsive records.  Seidel Decl. ¶ 4, ECF No. 31-3.  The FBI released 28 of those pages in full, released 72 pages in part, and withheld 118 pages in full pursuant to FOIA Exemptions.[1]  *Id*.  The documents released in full include two March 2017 letters from congressional committees and a document titled "SSCI Transmittal and Document Receipt."  Ex. C. to Seidel Decl., ECF No. 31-3.  The FBI released several other documents with redactions, including a 4-page email with the subject line "10/27 CTD Close Out" and an Intelligence Program Policy Guide.  Ex. B to Lynch Decl., ECF No. 35-1.

The FBI withheld parts of both records under Exemption 3 as containing information protected by Section 102A(i)(1) of the National Security Act of 1947.  Seidel Decl. ¶¶ 6–7, 13; Ex. C to Seidel Decl.  The FBI also withheld portions of both documents pursuant to Exemption 7(E) as disclosing the FBI's investigative focus, law enforcement techniques, and operational directives in a manner that could reasonably be expected to risk circumvention of the law.  Seidel Decl. ¶¶ 24–26; Ex. C to Seidel Decl.  Finally, the FBI made one redaction to the email pursuant to Exemption 7(D) to protect the identity of a confidential source.  Seidel Decl. ¶¶ 6–7; 20–23; Ex. C to Seidel Decl.  The Project contests the FBI's application of these FOIA exemptions to the records.  The DOJ now renews its motion for summary judgment, ECF No. 31, and the Project cross-moves for summary judgment, ECF No. 34.

---

[1]     The FBI withheld two pages as "duplicates of pages accounted for elsewhere in the FBI's productions."  Seidel Decl. ¶ 33.

### III.  LEGAL STANDARD

The Freedom of Information Act is meant "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."  *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)).  It "directs that 'each agency, upon any request for records . . . shall make the records promptly available to any person' unless the requested records fall within one of the statute's nine exemptions."  *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (quoting 5 U.S.C. § 552(a)(3)(a)).  "Consistent with the Act's goal of broad disclosure," those exemptions should be "given a narrow compass."  *U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 151 (1989).  "The agency bears the burden of establishing that a claimed exemption applies."  *Citizens for Resp. and Ethics in Wash. v. U.S. Dep't of Just.*, 746 F.3d 1082, 1088 (D.C. Cir. 2014).

Because FOIA cases do not ordinarily involve disputed facts, they "are typically and appropriately decided on motions for summary judgment."  *Moore v. Bush*, 601 F. Supp. 2d 6, 12 (D.D.C. 2009) (citations omitted).  Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In assessing whether the movant has met that burden, a court "must view the evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in his favor, and eschew making credibility determinations or weighing the evidence."  *Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir. 2008) (citations omitted).  "This burden does not shift even when the requester files a cross-motion for summary judgment because 'the Government ultimately has the onus of proving that the documents are exempt from disclosure.'"  *Hardy v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 243 F. Supp. 3d

155, 162 (D.D.C. 2017) (cleaned up) (quoting *Pub. Citizen Health Rsch. Grp. v. Food and Drug Admin.*, 185 F.3d 898, 904–05 (D.C. Cir. 1999)).

Even if a FOIA exemption applies, an agency cannot withhold information unless it also "reasonably foresees that disclosure would harm an interest protected by" the exemption.  5 U.S.C. § 552(a)(8)(A)(i)(I); *see Leopold v. Dep't of Just.*, 94 F.4th 33, 37 (D.C. Cir. 2024) ("Even if an exemption covers an entire agency record, the agency still must release any reasonably segregable information within the record that could be disclosed without causing reasonably foreseeable harm to an interest that the exemption protects."); *Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 3 F.4th 350, 369 (D.C. Cir. 2021) (explaining the FOIA Improvement Act of 2016's "foreseeable harm" requirement).  This requirement does not apply, however, to Exemption 3.  *See Leopold*, 94 F.4th at 37.

The Supreme Court and the D.C. Circuit "have expressly recognized the propriety of deference to the executive in the context of FOIA claims which implicate national security." *Ctr. for Nat. Sec. Stud. v. U.S. Dep't of Just.*, 331 F.3d 918, 927 (D.C. Cir. 2003).  Ultimately, "in the national security context," a federal agency's "arguments need only be both 'plausible' and 'logical' to justify the invocation of a FOIA exemption."  *Am. C.L. Union v. U.S. Dep't of Def.*, 628 F.3d 612, 624 (D.C. Cir. 2011).  "[S]ummary judgment is warranted on the basis of agency affidavits when the affidavits describe 'the justifications for nondisclosure with reasonably specific detail . . . and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'"  *Wolf v. Cent. Intel. Agency*, 473 F.3d 370, 374 (D.C. Cir. 2007) (quoting *Miller v. Casey,* 730 F.2d 773, 776 (D.C. Cir. 2007)).

## IV.  ANALYSIS

The Court evaluates the FBI's application of each FOIA exemption to the relevant records.  The Project contends that the FBI failed to carry its burden to satisfy Exemption 3, 7(D), or 7(E), and that the Court should order the FBI to release the withheld records.  Having reviewed the FBI's declarations and the redacted versions of the records themselves, the Court concludes that the agency properly applied Exemptions 3 and 7(E) to protect intelligence sources and methods, as well as law enforcement techniques and procedures.  In addition, the agency carried its burden to show that it applied Exemption 7(D) to protect the identity of a confidential source.  As the DOJ emphasizes, the Project attacks the sufficiency of the FBI's declaration rather than the propriety of any specific redactions within the records.  The Court therefore focuses its attention on the adequacy of the FBI's explanations.

### A.  Application of Exemption 3

FOIA Exemption 3 protects material "specifically exempted from disclosure by statute," provided that the statute "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue," or "establishes particular criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3).  When evaluating a claim under Exemption 3, courts must determine whether the statute identified by the agency qualifies as an exemption statute and, subsequently, whether the material falls within the scope of the statute.  *Cent. Intel. Agency v. Sims*, 471 U.S. 159, 167–68 (1985); *Fitzgibbon v. Cent. Intel. Agency*, 911 F.2d 755, 761 (D.C. Cir. 1990).

The FBI states that it withheld portions of the requested records because they fall within § 102A(i)(1) of the National Security Act of 1947.  Seidel Decl. ¶ 13.  The statute mandates that "[t]he Director of National Intelligence shall protect, and shall establish and enforce policies to

protect, intelligence sources and methods from unauthorized disclosure."  50 U.S.C. § 3024(i)(1).

The parties do "not dispute that this statute is a withholding statute under Exemption 3."  Pl.'s

Opp'n Mot. Summ. J. at 5 ("Pl.'s Opp'n"), ECF No. 33-1; *see also Sims*, 471 U.S. at 167.

Rather, the Project argues that the FBI has "failed to 'demonstrate [Exemption 3's] applicability

in a nonconclusory and detailed fashion.'"  Pl.'s Opp'n at 5 (quoting *Shapiro v. U.S. Dep't of*

*Just.*, 239 F. Supp. 3d 100, 123 (D.D.C. 2017)).  As such, the Project does not argue that the

records fall *outside* the scope of § 3024(i)(1), but rather that the agency has not provided the

Court with a sufficient explanation to justify invoking Exemption 3, and that the Court should

therefore order the FBI to release the unredacted records.  *Id.* at 5–7.  The Court finds the FBI's

justifications sufficient.

  The agency explains that "intelligence sources and methods would be revealed if any of

the withheld information is disclosed to Plaintiffs" and that the agency "is prohibited from

disclosing such information."  Seidel Decl. ¶ 15.  The fully and partially redacted pages of the

Intelligence Program Policy Guide contain information which, "if released, would compromise

the ability of the intelligence community to carry out its mission because it would disclose how

and when the FBI uses certain intelligence methods."  *Id.* ¶ 16.  "The Guide directs FBI

employees how to 'put together' pieces of intelligence from various investigations to identify

trends across the United States."  *Id.* ¶ 30.  These "[a]gency [declarations] enjoy 'a presumption

of good faith [that] cannot be rebutted by purely speculative claims' of agency malfeasance."

*Schaerr v. U.S. Dep't of Just.*, 69 F.4th 924, 930 (D.C. Cir. 2023) (quoting *In re Clinton*, 973

F.3d 106, 113 (D.C. Cir. 2020)).

  The Guide itself supports the FBI's explanation: the document details the FBI's

intelligence apparatus, including the roles of various officials, production and dissemination of

intelligence reports, case management, and staff assignment.  *See generally* Ex. A to Lynch Decl. at 4–86, ECF No. 35-1.  Pages withheld in full describe the duties of intelligence analysts; the FBI's processes for threat, domain, and targeting analysis; and collection management.  *See* Ex. C to Seidel Decl. (listing pages withheld in full); Ex. A to Lynch Decl. at 8–10 (Guide table of contents).  Partial redactions cover, for instance, the "Processes and Procedures" of the FBI's "intelligence cycle," *id.* at 30, issues related to "Intelligence Support for Special Events and Critical Incidents," *id.* at 61, and the duties of Confidential Human Source Coordinators, *id.* at 27–28.  The content of sections surrounding the redacted material supports the notion that the redacted text explains portions of the agency's intelligence program.  The FBI's explanation is sufficient to demonstrate that the Intelligence Program Policy Guide falls within the scope of § 3024(i)(1), and the agency therefore properly redacted information in the record to protect intelligence sources and methods from unauthorized disclosure.

The FBI similarly carries its burden regarding the 4-page email, "which contain[s] briefing reports from multiple divisions regarding national security investigations, policies and practices, which, through discussion of information gathered, would reveal sources and techniques the FBI uses to gather information and intelligence in national security investigations."  Seidel Decl. ¶ 16.  Releasing the unredacted email "would provide criminal elements, terrorists and foreign adversaries a preview of how the FBI will respond to similar investigative situations, allowing them to preemptively deploy countermeasures to disrupt FBI investigative efforts of their own, unrelated activities."  *Id.* ¶ 27.  The redacted email includes daily updates from various Counterterrorism Division offices regarding ongoing operations, including potential terrorism charging decisions.  *See* Ex. B to Lynch Decl. at 88–91.  Even without "deference to the executive in the context of FOIA claims which implicate national

security," *Ctr. for Nat. Sec. Stud.*, 331 F.3d at 927, the FBI carries its burden to demonstrate that the email falls within § 3024(i)(1) as revealing intelligence sources and methods.  Courts in this district have found that agencies carry their burdens when providing similar levels of detail describing records withheld under Exemption 3.  *See, e.g.*, *Whalen v. U.S. Marine Corps*, 407 F. Supp. 2d 54, 58 (D.D.C. 2005); *Shapiro v. Dep't of Just.*, No. 12-cv-313, 2020 WL 3615511, at *22 (D.D.C. July 2, 2020).  The FBI's showing additionally exceeds the "[b]arren assertions" found insufficient in other cases.  Pl.'s Opp'n at 5 (quoting *Founding Church of Scientology of Wash., D. C., Inc. v. Nat'l Sec. Agency*, 610 F.2d 824, 831 (D.C. Cir. 1979)).

The Project provides nothing to "rebut[]" the FBI's declaration and the inferences available from the redacted documents the agency provided.  *Schaerr*, 69 F.4th at 930.  The Project nonetheless argues that the FBI should provide a more detailed explanation so that it can meaningfully challenge the agency's reasoning for withholding the records.  Pl.'s Reply in Supp. of Cross-Mot. for Summ. J., ECF No. 37, at 3.  Yet the Project points to a single paragraph of Mr. Seidel's declaration to argue that the FBI's justification is too shallow.  *Id.* at 2, 5 (citing only Seidel Decl. ¶ 16); Pl.'s Opp'n at 6 (same).  The Project largely ignores the information provided in the full scope of the 18-page declaration.  *See* Seidel Decl. ¶¶ 18–19, 23, 27–31.  In addition, the Project declines to engage with the redacted documents, which the agency has provided, *see* Ex. A to Lynch Decl., or to explain to the Court why any specific redactions are inappropriate in the face of the agency's explanations.  The Project has the information it would need to challenge the FBI's use of Exemption 3.  The FBI made proper use of the exemption in this case.

### B.  Application of Exemption 7(E)

Exemption 7(E) permits withholding of

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

5 U.S.C. § 552(b)(7)(E).  To properly withhold records under the "techniques and procedures" prong of 7(E), the agency must "demonstrate that its withholdings meet three basic requirements." *Prop. of the People, Inc. v. Dep't of Just.*, 539 F. Supp. 3d 16, 28 (D.D.C. 2021). "First, it must show that the documents were in fact 'compiled for law enforcement purposes' and not for some other reason. *Id.* (quoting 5 U.S.C. § 552(b)(7)(E)).  "To show that the disputed documents were 'compiled for law enforcement purposes,' the FBI need only 'establish a rational nexus between the investigation and one of the agency's law enforcement duties and a connection between an individual or incident and a possible security risk or violation of federal law.'" *Blackwell v. Fed. Bureau of Investigation*, 646 F.3d 37, 40 (D.C. Cir. 2011) (quoting *Campbell v. Dep't of Just.*, 164 F.3d 20, 32 (D.C. Cir. 1998)).  "Second, the Government must establish that the records contain law-enforcement techniques and procedures that are 'generally unknown to the public.'" *Prop. of the People*, 539 F. Supp. 3d at 28.

"Finally, it must demonstrate that disclosure 'could reasonably be expected to risk circumvention of the law.'" *Id.*; *see also* 5 U.S.C. § 552(b)(7)(E)).  The standard looks "not just for circumvention of the law, but for a risk of circumvention." *Mayer Brown LLP v. Internal Revenue Serv.*, 562 F.3d 1190, 1194 (D.C. Cir. 2009).  Exemption 7(E) requires only that the agency "demonstrate[] logically how the release of the [requested] information might create a risk of circumvention of the law." *Id.*  "Exemption 7(E) sets a relatively low bar for the agency

to justify withholding." *Blackwell*, 646 F.3d at 42.  "Because the FBI specializes in law enforcement, its decision to invoke [E]xemption 7 is entitled to deference."  *Campbell*, 164 F.3d at 32 (citing *Pratt v. Webster*, 673 F.2d 408, 419 (D.C. Cir. 1982)).

The Project challenges the FBI's application of Exemption 7 on four bases.  First, the Project asserts that the FBI failed to demonstrate that the withheld records were compiled for law enforcement purposes.  *See* Pl.'s Opp'n at 7–10.  Second, the Project argues that the FBI does not show that its redactions protect law enforcement techniques or procedures.  *See id.* at 14–17.  Third, the Project contends that the FBI has not substantiated its fear that release of the information would lead to circumvention.  *See id.* at 17–18.  Fourth, the Project states that the FBI has not sufficiently demonstrated "foreseeable harm."  *Id.* at 18.  Each of these arguments fails for the reasons discussed below.

### a.  Compilation for Law Enforcement Purposes

The Project asserts that the FBI has "failed to carry its burden of demonstrating that the records were created for a law enforcement purpose."  Pl.'s Opp'n at 7.  The agency responds that both Mr. Seidel's declaration and the records themselves demonstrate that the FBI created the records for law enforcement purposes.  *See* Def.'s Opp'n Pl.'s Cross-Mot. Summ. J. ("Def.'s Opp'n"), ECF No. 35, at 5–6.  The Court agrees that the FBI created the records here—an email tracking terrorism investigations and an Intelligence Program Policy Guide—for law enforcement purposes.

The Seidel Declaration explains that the FBI created the guide as part of "the development of policy within the FBI's Directorate of Intelligence."  Seidel Decl. ¶ 19.  The FBI explains at length how the agency uses the Guide, including its "specific roadmaps" for techniques "used to analyze information obtained from national security investigations."  *Id.*

¶ 30.  The Guide "is used by Intelligence Analysts and FBI Special Agents to draft Intelligence Products that identify specific trends in their areas of operation, and across the United States." *Id.*  Review of the document itself supports the notion that it was created for law enforcement purposes.  The record details "Roles and Responsibilities" of FBI intelligence officials, as well as processes and procedures for intelligence collection, analysis, management, and recordkeeping. Ex. A to Lynch Decl. at 8–14.  The guide declares that its purpose "is to detail the roles and procedures in carrying out the [FBI's] Intelligence Program."  *Id.* at 15.  The FBI's explanation of the document, as well as the document itself, confirm that it was created to further the FBI's law enforcement mission.

The correspondence at issue also represents "an email among personnel in one of the FBI's Counterterrorism Law Units tracking counterterrorism-related investigations."  Seidel Decl. ¶ 19.  It is an "internal email between FBI employees . . .  providing daily 'close-out' updates on specific investigative matters, with specific analytical techniques discussed in three blocks on [one page] and two blocks on [another]."  *Id.* ¶ 30.  Again, the record itself supports this description.  The email includes updates from various elements of the FBI Counterterrorism Division, including apparent references to individuals under investigation.  Ex. B to Lynch Decl. at 88–89.  The agency's explanation, along with the record itself, sufficiently demonstrates that the email was created for law enforcement purposes.

The Project contends that the FBI must demonstrate that each record was created in relation to a specific investigation or enforcement proceeding, and that the agency has not done so here.  *See* Pl.'s Opp'n at 7–8 (discussing *Bartko v. U.S. Dep't of Just.*, 898 F.3d 51, 64 (D.C. Cir. 2018)).  Yet under Exemption 7(E), "an agency may seek to block the disclosure of internal agency materials relating to guidelines, techniques, sources, and procedures for law enforcement

investigations and prosecutions, even when the materials have not been compiled in the course of a specific investigation." *Tax Analysts v. Internal Revenue Serv.*, 294 F.3d 71, 79 (D.C. Cir. 2002); *see also Morley v. Cent. Intel. Agency*, 508 F.3d 1108, 1129 (D.C. Cir. 2007) (upholding withholding of CIA security clearance practices).  The Project's position would mean that agencies could never legally withhold broad policy documents governing investigations and procedures, as those documents generally are not connected to individual investigations.  In addition, adopting the Project's rule would mean that federal agencies could withhold documents revealing application of techniques and procedures to individual cases, but that agencies could not withhold the guidance documents fully detailing those practices.  That would turn Exemption 7(E) on its head.

> *b.  Protection of Law Enforcement Techniques and Procedures*

Relatedly, the Project argues that the FBI has not demonstrated that the redactions protect law enforcement techniques or procedures.  *See* Pl.'s Opp'n at 14–17.  The DOJ again responds that the declaration and the documents themselves show that the redactions protect law enforcement techniques or procedures.  *See* Def.'s Opp'n at 7–10.  The DOJ emphasizes that the Project does not challenge any specific redactions, but rather "attacks the level of detail in the Seidel Declaration."  *Id.* at 8.

The Intelligence Program Policy Guide indisputably contains law enforcement techniques and procedures.  The FBI explains that the guide provides "specific roadmaps" and "details about how intelligence is to be used in investigations."  Seidel Decl. ¶ 30.  Redacted portions of the Guide include, for instance, the specific duties of various FBI officials related to intelligence activities, *see* Ex. A to Lynch Decl. at 16–28, portions of the "intelligence cycle," *id.* at 31, and "collection requirements," *id.* at 32.  The record includes descriptions of specific reports to be

produced, *id.* at 36–37, coordination, *id.* at 41, assignment of personnel, *id.* at 60, and file management, *id.* at 68.  These topics plainly constitute the FBI's law enforcement techniques and procedures.

The FBI similarly demonstrates that the redacted email provides information on law enforcement techniques and procedures.  As the agency explains, revealing "non-public investigative focuses of the FBI . . . would provide criminal elements, terrorists and foreign adversaries a preview of how the FBI will respond to similar investigative situations, allowing them to preemptively deploy countermeasures to disrupt FBI investigative efforts of their own, unrelated activities."  Seidel Decl. ¶ 27.  "[R]evealing the FBI's points of focus in the particular investigations would necessarily reveal its techniques and procedures."  *Reps. Comm. for Freedom of Press v. Fed. Bureau of Investigation*, No. 17-cv-1701, 2022 WL 13840088, at *8 (D.D.C. Oct. 21, 2022).  "Indeed, courts in this District routinely allow the FBI to protect this kind of information."  *Id.* (collecting cases).

The Project contends that the FBI must provide more.  *See* Pl.'s Opp'n at 14.  Yet with the FBI's explanations and the redacted documents themselves, "the Court can deduce something of the nature of the techniques in question."  *New Orleans Workers' Ctr. for Racial Just. v. U.S. Immigr. & Customs Enf't*, 373 F. Supp. 3d 16, 65 (D.D.C. 2019).  The Government has provided sufficient explanation of the techniques and procedures at stake, and the Court finds those explanations logical, plausible, and supported by the record.

### c.  Risk of Circumvention

The Project contends that the FBI has failed to carry its burden to show that release of the two records here would lead to circumvention of the law, as the FBI has submitted an "inadequate affidavit."  Pl.'s Opp'n at 17.  The DOJ, in contrast, asserts that the subjects of the

records here fall "within the core of Exemption 7(E)," Def.'s Mot. Summ. J. at 12, and that Mr.
Seidel's declaration explains at length how the material could reasonably be expected to risk
circumvention of the law.  Def.'s Opp'n at 11.  The Court agrees with the DOJ.

First, "Exemption 7(E) sets a relatively low bar for the agency to justify withholding."
*Blackwell*, 646 F.3d at 42.  "Exemption 7(E) clearly protects information that would *train*
potential violators to evade the law or *instruct* them how to break the law."  *Mayer Brown*, 562
F.3d at 1193.  The exemption "goes further," however, by "exempt[ing] from disclosure
information that could *increase the risks* that a law will be violated or that past violators will
escape legal consequences."  *Id.*  The FBI need only "demonstrate[ ] logically how the release of
[the requested] information might create a risk of circumvention of the law."  *Id.* at 1194.

The FBI explains that the Intelligence Program Policy Guide "directs FBI employees how
to 'put together' pieces of intelligence from various investigations to identify trends across the
United States."  Seidel Decl. ¶ 30.  "Disclosure of this information," the declaration continues,
"would provide valuable insight into individuals of investigative interest and allow them to
thwart these techniques, and would provide valuable insight into how the FBI uses intelligence."
*Id.*  Revealing the unredacted Guide "would enable criminals and foreign adversaries targeted by
these techniques to predict and circumvent their use by the FBI."  *Id.*  As previously noted, the
Guide instructs individual FBI officials on their roles in creation and analysis of intelligence,
tradecraft standards, coordination across offices, assignment of personnel, and file management,
among other topics.  *See generally* Ex. A to Lynch Decl. at 4–86.  These explanations
sufficiently demonstrate reasonable expectation of a risk of circumvention and mirror those the
D.C. Circuit has previously found sufficient to justify withholding of records under Exemption
7(E).  *See, e.g.*, *Blackwell*, 646 F.3d at 42 (discussing reasoning for withholding "details about

procedures used during the forensic examination of a computer"); *Morley*, 508 F.3d at 1128–29 (reciting reasoning for withholding CIA security clearance techniques); *Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mex.*, 740 F.3d 195, 205 (D.C. Cir. 2014) (discussing withholding of "guidelines that inform emergency personnel how to manage a dam failure").

The FBI's explanation for withholding the coordination email additionally passes muster. The declaration notes that not only would release of the unredacted email "alert" the "investigative targets . . . to the FBI's interest in their activities," but it would also "provide criminal elements, terrorists and foreign adversaries a preview of how the FBI will respond to similar investigative situations, allowing them to preemptively deploy countermeasures to disrupt FBI investigative efforts of their own, unrelated activities."  Seidel Decl. ¶ 27.  The email additionally contains discussion of "specific analytical techniques," *id.* ¶ 13, which raise similar concerns to the Guide.  As noted above, courts have repeatedly concluded that a law enforcement agency's investigative focus may properly be withheld under Exemption 7(E).  *See, e.g.*, *Poitras v. Dep't of Homeland Sec.*, 303 F. Supp. 3d 136, 159 (D.D.C. 2018); *Amuso v. U.S. Dep't of Just.*, 600 F. Supp. 2d 78, 101 (D.D.C. 2009).

The FBI's explanations "demonstrate[ ] logically how the release of [the requested] information might create a risk of circumvention of the law."  *Mayer Brown*, 562 F.3d at 1194. The FBI has thus satisfied the "relatively low bar for the agency to justify withholding" of portions of the Guide and email under Exemption 7(E).  *Blackwell*, 646 F.3d at 42.

### d.  Foreseeable Harm

The Project argues that the FBI's explanation of the foreseeable harm attending release of the unredacted records is insufficient because it is "boilerplate" and "wholly generalized and

conclusory."  Pl.'s Opp'n at 18 (quoting *Reps. Comm.*, 3 F.4th at 370).  The DOJ responds that the FBI made a particularized showing with respect to foreseeable harm under Exemption 7(E).  Def.'s Opp'n at 10.  The Court finds that the FBI has carried its burden to demonstrate foreseeable harm to the interests protected by Exemption 7(E).

The agency "bears the burden of showing that it 'reasonably foresees that disclosure would harm an interest protected by an exemption' or that 'disclosure is prohibited by law.'" *Leopold*, 94 F.4th at 37 (quoting 5 U.S.C. § 552(a)(8)(A)(i)).  "[W]hether a requested record falls within an exemption and whether the disclosure of that record would foreseeably harm an interest protected by the exemption are distinct, consecutive inquiries."  *Id.*  "Agencies, therefore, must provide 'a focused and concrete demonstration of why disclosure of the particular type of material at issue will . . . actually impede' the interests protected by a FOIA exemption."  *Id.* (quoting *Reps. Comm.*, 3 F.4th at 370).

Although evaluating the reasonable foreseeability of harm to an interest protected by an exemption "impose[s] an independent and meaningful burden on agencies," *Reps. Comm.*, 3 F.4th at 369, meeting Exemption 7(E)'s requirement that release "might create a risk of circumvention of the law," *Mayer Brown*, 562 F.3d at 1194, provides clues as to the likelihood of harm.  If release of the information "increase[s] the risks that a law will be violated or that past violators will escape legal consequences," *id.* at 1193, then it stands to reason that releasing the information would "actually impede" the interests protected by Exemption 7(E).

Indeed, the Court looks to much of the same indicia in this analysis as it did when assessing the risk of circumvention.  The FBI has explained how releasing the Guide would empower "criminals and foreign adversaries targeted by these techniques to predict and circumvent their use by the FBI."  Seidel Decl. ¶ 30.  Releasing the email would also "provide

criminal elements, terrorists and foreign adversaries a preview of how the FBI will respond to similar investigative situations, allowing them to preemptively deploy countermeasures to disrupt FBI investigative efforts of their own, unrelated activities." *Id.* ¶ 27.  The Court views the FBI's justifications with due "defer[ence] to executive affidavits predicting harm to the national security." *Ctr. for Nat. Sec. Stud.*, 331 F.3d at 927.  Based on these explanations and a review of the redacted documents, the Court finds that the FBI has provided "a focused and concrete demonstration of why disclosure of" the Guide and email "will, in the specific context of the agency action at issue, actually impede the interests protected by a FOIA exemption." *Leopold*, 94 F.4th at 37.

### C.  Application of Exemption 7(D)

FOIA Exemption 7(D) provides that an agency need not disclose information that "could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency." 5 U.S.C. § 552(b)(7)(D).  "[A] source is confidential within the meaning of Exemption 7(D) if the source provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred." *Boyd v. Crim. Div. of U.S. Dep't of Just.,* 475 F.3d 381, 389 (D.C. Cir. 2007) (quoting *U.S. Dep't of Just. v. Landano*, 508 U.S. 165, 172 (1993)).  "Under Exemption 7(D), the question is not whether the requested document is of the type that the agency usually treats as confidential, but whether the particular source spoke with an understanding that the communication would remain confidential." *Landano*, 508 U.S. at 172.  "Exemption 7(D) requires no balancing of public and private interests." *Roth v. U.S. Dep't of Just.*, 642 F.3d 1161, 1184 (D.C. Cir. 2011).  Some courts have described 7(D) as "the strongest of all of FOIA's law enforcement exemptions." *Bullock v. Fed. Bureau of Investigation*, 577 F. Supp. 2d 75, 79 (D.D.C. 2008).

Courts examine application of Exemption 7(D) on a case-by-case basis. *Landano*, 508 U.S. at 179-180. "The agency invoking Exemption 7(D) bears the burden of proving that it applies." *Roth*, 642 F.3d at 1184. An agency may carry its burden through declarations alone. *See Labow v. U.S. Dep't of Just.*, 831 F.3d 523, 531 (D.C. Cir. 2016). *In camera* review may be necessary, however, when the agency cannot provide a full, public explanation without "giving away the information it is trying to withhold." *Roth*, 642 F.3d at 1185.

The Court finds that the FBI's explanation for withholding the name of its foreign source is both "logical" and "plausible." *Am. C.L. Union*, 628 F.3d at 624. The FBI has carried its burden here to demonstrate both that FOIA Exemption 7(D) applies and that disclosure would harm an interest protected by the exemption. The FBI explains that "[i]n this case, the FBI has previously received an express request from a foreign government to withhold information pertaining to an ongoing investigation and possible pending charges in a case shared by the United States and that foreign law enforcement agency." Seidel Decl. ¶ 23. The FBI added that "the withheld information would identify the country that has been assured its identity would be kept confidential" and that "[d]isclosure could reveal both countries' interest and position in the investigation." *Id.* Because the FBI asserts that it has an express confidentiality agreement with a source, the Court need not consider *Roth*'s four-factor test governing implied confidentiality agreements. *See Roth*, 642 F.3d at 1184; *Labow*, 831 F.3d at 531.

The record itself further supports the FBI's assertion that the information contains the identity of a confidential source, namely a "foreign agency." 5 U.S.C. § 552(b)(7)(D). The email details operations of the International Terrorism Operations Section ("ITOS"). *See In re Sept. 11 Litig.*, 621 F. Supp. 2d 131, 162 (S.D.N.Y. 2009) (discussing ITOS). The language states that the Section was "[w]aiting for [redacted] to confirm when/whether they are also

charging [an individual]." Ex. B to Lynch Decl. at 88. The context indicates that the FBI communicated with a foreign government regarding a pending terrorism prosecution. It would not be unusual for this information to be shared in confidence.[2]

The Court additionally finds that the FBI showed that disclosure would foreseeably harm an interest protected by Exemption 7(D). The FBI explained that "[b]ecause of the sensitive nature of the information," along with "the FBI's express assurance to keep this investigation confidential, this foreign government has a reasonable expectation that its identity and the information it provided to the FBI will remain confidential." Seidel Decl. ¶ 23. Revealing the information "could be detrimental to the necessary cooperation of the foreign government agencies with the FBI." *Id*. In addition, revealing the identity of the foreign agency source "would seriously impair the FBI's effectiveness in assisting with or participating in future investigations with foreign government agencies." *Id*. The agency's explanation represents "a focused and concrete demonstration of why disclosure of" the confidential foreign agency source "will . . . actually impede the interests protected by" Exemption 7(D). *Leopold*, 94 F.4th at 37.

The agency's explanation of its basis for invoking Exemption 7(D) is both "logical" and "plausible." *Am. C.L. Union*, 628 F.3d at 624. The FBI asserts that it acquired the information from a foreign agency under the condition of confidentiality, Seidel Decl. ¶ 23, and the record lends credibility to that contention. In addition, "the [C]ourt owes substantial weight to detailed agency explanations in the national security context." *King v. U.S. Dep't of Just.*, 830 F.2d 210, 217 (D.C. Cir. 1987).

---

[2]     In addition, federal agencies regularly classify "foreign government information," further supporting the notion that a foreign agency would expect its discussion of charges in a terrorism case to remain confidential. Exec. Order No. 13,526, § 1.4(b), 75 Fed. Reg. 707, 709 (Dec. 29, 2009).

The Project nonetheless contends that "the Seidel Declaration mirrors the inadequate declaration rejected in *Campbell*." Pl.'s Opp'n at 12. In *Campbell*, the D.C. Circuit observed that to avail itself of Exemption 7(D), "the FBI must present 'probative evidence that the source did in fact receive an express grant of confidentiality.'" 164 F.3d at 34. There, the court took issue with the basis for the FBI official's knowledge of the confidentiality agreement, noting that the "declaration simply asserts that various sources received express assurances of confidentiality without providing any basis for the declarant's knowledge of this alleged fact." *Id.* at 34–35. In addition, the "particular events" at issue "occurred more than 30 years" prior, such that the court deemed more information necessary to establish the credibility of the government's position. *Id.* at 35.

The concerns the D.C. Circuit expressed in *Campbell* are not present here. Mr. Seidel's declaration is based upon "[his] personal knowledge, upon information provided to [him] in [his] official capacity, and upon conclusions and determinations reached and made in accordance therewith." Seidel Decl. ¶ 2. The email in question was sent in October 2020, during Mr. Seidel's tenure as Section Chief of the Record/Information Dissemination Section. *Id*. ¶ 1. In addition, it is reasonable to believe that relevant institutional knowledge remained within the FBI to support the agency's understanding that a confidential agreement existed or continues to exist with the foreign agency in question. The FBI's provision of the contested documents, which allows for this Court's direct review, lends further credibility to the government's assertions in a manner not present in *Campbell*. *See* 164 F.3d at 35 (noting the court's inability to meaningfully review the records).

The cases to which the Project points do not counsel otherwise. In *Lazaridis v. U.S. Dep't of Just.*, 766 F. Supp. 2d 134 (D.D.C. 2011), the court found the FBI's invocation of

Exemption 7(D) unsubstantiated because the declarant did "not claim to have any personal knowledge of the [confidentiality] agreement" and "presented no probative evidence of such an agreement." *Id.* at 148. The agency there based its application of 7(D) on "an implied grant of confidentiality." *Id.* That is inapposite here, where the FBI cites an express confidentiality agreement, the declarant states he has personal knowledge of the agreement, the FBI provides additional details about the joint terrorism investigation, and the records themselves support the confidential nature of the FBI's relationship with the foreign agency. Similarly, a "notation[] on the face of a withheld document" may indicate that information was provided in confidence, *Shapiro*, 2020 WL 3615511, at *33 (quoting *Campbell*, 164 F.3d at 34), but the Project cites no authority indicating that notations are *necessary*. Additionally, where the agency provides a more detailed explanation of the nature of the "cooperative investigation," as the FBI has done here, courts are more likely to find the declaration sufficient. *Prop. of the People, Inc.*, 539 F. Supp. 3d at 27.

## V. CONCLUSION

For the foregoing reasons, DOJ's motion for summary judgment (ECF No. 31) is **GRANTED**, and the Project's cross-motion for summary judgment (ECF No. 34) is **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  June 6, 2024                                                    RUDOLPH CONTRERAS
                                                                                          United States District Judge